**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JENNIFER LYNN LEWIS,**

        **Plaintiff,**

**v.**                                                    **Case No.: 3:12-cv-08073**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

        **Defendant.**

**<u>MEMORANDUM OPINION</u>**

      This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.**    <u>**Procedural History**</u>

      Plaintiff, Jennifer Lynn Lewis ("Claimant"), filed for DIB and SSI on August 27, 2009, alleging a disability onset date of September 11, 2007, (Tr. at 171, 178), due to "depression, anxiety, back problems, arthritis of spine, degenerative disc disease, lumbar

disc disease, bulging disc in back, synovial cysts, asthma, irritable bowel syndrome and nocturnal asthma." (Tr. at 231). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 74, 85). Claimant filed a request for a hearing, (Tr. at 91), which was held on November 24, 2010 before the Honorable Charlie P. Andrus, Administrative Law Judge ("ALJ"). (Tr. at 34-57). A supplemental administrative hearing was held on August 24, 2011. (Tr. at 58-69). By written decision dated September 8, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-27). The ALJ's decision became the final decision of the Commissioner on September 20, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On November 23, 2012, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on February 1, 2013. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). Accordingly, this matter is ripe for disposition.

## II.   Claimant's Background

Claimant was 38 years old at the time of applying for benefits and 36 years old at the time of her alleged onset of disability. (Tr. at 171). She is a high school graduate and communicates in English. (Tr. at 39). Claimant has prior work experience as a hairdresser, a hospital billing clerk, and an administrative coordinator. (Tr. at 39-40, 51).

## III.   Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of

substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment

meets or is equal to a listed mental disorder. *Id. §§* 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2013. (Tr. at 17, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since September 11, 2007, the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of degenerative joint disease, depression, and anxiety. (Tr. at 18-19, Finding No. 3). However, Claimant's asthma and chronic obstructive pulmonary disease (COPD), irritable bowel syndrome (IBS), headaches, post-traumatic stress disorder (PTSD), and attention deficit hyperactivity disorder (ADHD) did not constitute severe impairments. (Tr. at 18-19). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination do not meet or medically equal any of the listed impairments. (Tr. at 19-20, Finding No. 4). Therefore, the ALJ determined that Claimant had the RFC to:

> [O]ccasionally lift up to 50 pounds and frequently lift up to 20 pounds. At one time, she can sit for three hours, stand for two hours, and walk for one hour. Total in an eight-hour day, she can sit for four hours, stand for three and walk for two. She can never climb ladders or crouch and can only occasionally crawl, kneel, stoop, or balance. She can frequently climb stairs. She can only occasionally be subjected to vibration. She is moderately (more than a slight limitation but the individual can still function satisfactorily) limited in the ability to interact with the public, supervisors and co-workers and respond appropriately to usual work situations and to changes in routine work settings.

(Tr. at 20-25, Finding No. 5). At the fourth step of the analysis, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 25, Finding No. 6).

Consequently, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC under the fifth and final step to determine if she would be able to engage in substantial gainful activity. (Tr. at 25-26, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1971 and was defined as a younger individual; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the ALJ's disability determination. (Tr. at 25, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 25-26, Finding No. 10). At the light level, Claimant could work as a routing clerk, machine tender, or parking garage attendant; and at the sedentary level, Claimant could perform jobs such as a security monitor, inspector, or order clerk. (Tr. at 26). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act. (*Id.*, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is not supported by substantial evidence on the record. (ECF No. 11 at 4-7). Claimant contends that "[o]bviously, [her] physical and mental impairments in combination equal a Listed Impairment," or in the alternative that "it is [her] position that her impairments prevent her from engaging in substantial gainful activity." (*Id.* at 5). More specifically, Claimant asserts that the ALJ (1) incorrectly found that Claimant's PTSD was not a severe impairment, (*Id.* at 6); (2) improperly assessed Claimant's credibility, (*Id.* at 7-9); and (3) failed to accord proper weight to Claimant's treating source opinions, (*Id.* at 10-12).

## V.    **Relevant Medical Records**

The Court has reviewed the transcript of proceedings in its entirety including the

medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

On March 28, 2008, Claimant was admitted to Cabell Huntington Hospital with complaints of thoracic back pain after she "fell striking her upper back 2 weeks ago." (Tr. at 398). Claimant reported that she "had achy pain until days ago when the discomfort became constant and burning." (*Id.*). The emergency room physician observed "tenderness to the slightest touch on the right thoracic paraspinal area, without swelling, redness or bruising." (*Id.*). X-rays of Claimant's chest and thoracic spine revealed that her heart and lungs were within normal limits, while "studies of the thoracic vertebrae show[ed] no bone or joint abnormality." (Tr. at 420-21). Claimant was discharged the following day with instructions to follow up with a family physician as needed. (Tr. at 400).

On January 29, 2009, Claimant was admitted to St. Mary's Hospital with complaints of back pain after she "slipped on ice Monday, then again today." (Tr. at 306). X-rays of Claimant's dorsal (thoracic) and lumbar spine showed "no bone or joint abnormality" in either her thoracic vertebrae or lumbar vertebrae. (Tr. at 309-10).

Between February 2009 and January 2010, Anita T. Dawson, D.O. treated Claimant as her primary care physician on an approximately monthly basis. (Tr. at 446-63, 517-27). On February 4, 2009, Claimant reported experiencing "fibromyalgia, bulging disc, back pain down into legs, [and] insides of thighs," (Tr. at 452), as well as anxiety. (Tr. at 463). Claimant stated that she "has not regularly taken medication in over a year" and that "when pain is unbearable she goes to [the] hospital." (Tr. at 452). On March 6, 2009, Claimant complained of lower back pain, and also reported that "Prozac made

[her] worse rather than better." (Tr. at 451). On April 2, 2009, Claimant reported experiencing "lower back pain into left hip pain, left leg pain." (Tr. at 450). Claimant also stated that Celexa was "no help" because it caused her to have stress and crying spells, while in the past Zoloft had "helped a lot but cost too much." (*Id.*). Claimant also requested "the cheapest" inhaler. (*Id.*).

On April 14, 2009, Claimant was admitted to St. Mary's Hospital with complaints of back pain after her boyfriend physically assaulted her. (Tr. at 297-305). X-rays of Claimant's cervical spine, dorsal (thoracic) spine, lumbar spine, ribs, and shoulder were all negative for any abnormalities or fracture, while a CT scan of Claimant's head revealed "no acute intracranial process" and "no acute hemorrhage." (Tr. at 300-05). Claimant reported to Dr. Dawson that she "has a cervical injury" and the ER physician had given her Robaxin and Percocet. (Tr. at 458). On April 27, 2009, Claimant requested an "MRI of lumbar spine" as she reported "experiencing severe pain in her low back since she was assaulted." (*Id.*).

On May 12, 2009, Claimant was admitted to Cabell Huntington Hospital with complaints of back pain. (Tr. at 378-96). Claimant reported that she "[h]ad some mild chronic back pain before [the assault] but much worse since assault, going down left leg with paresthesia." (Tr. at 378). Claimant's lumbosacral spine was observed as tender, and Claimant had "limited motion, active" due to pain. (Tr. at 386). Claimant requested an MRI, but the hospital was unable to accommodate her that day. (Tr. at 390). On May 21, 2009, Claimant's spine MRI results revealed "degenerative disc changes [in] L4-L5 and L5-S1" but no HNP or focal canal or foraminal narrowing." (Tr. at 460).

On June 1, 2009, Claimant was seen by Dr. Dawson with complaints of severe pain in her left hip and lower back; upper back and neck pain that was "doing better but still

hurts"; and left shoulder pain that "feels like it crunches." (Tr. at 449). Claimant complained that the effects of her Lortab prescription were "not lasting as long." (*Id.*). Claimant also reported experiencing "stomach problems, Baclofen not helping enough, [and] Zoloft no help." (*Id.*).

On June 17, 2009, Dr. Dawson provided a letter addressed "to whom it may concern," indicating that she had been Claimant's treating physician since February 4, 2009, during which time she had treated Claimant for "lumbar disc disease, arthritis of the spine, depression, allergies, lumbar sprain, IBS, and degenerative disc disease." (Tr. at 457). Dr. Dawson stated that "[d]ue to these conditions the patient is unable to work at this time and will remain so for at least the next six months." (*Id.*).

On August 6, 2009, Claimant called Dr. Dawson to request an MRI for evidence at court. (Tr. at 454). She reported tingling numbness in her "left hip-at the socket crotch and inside of leg" as well as numbness in her left hand and left arm. (*Id.*). On August 31, 2009, Claimant reported that her "left hip feels like a burning plate is on it" and that she was also experiencing pain in her shoulder blade, neck, and lower back." (Tr. at 447). Claimant also reported "having nightmares and can't sleep more than 2 hours." (*Id.*). She again requested an MRI "on top of back and neck." (*Id.*).

On September 10, 2009, Claimant had an MRI exam of her cervical and thoracic spine. (Tr. at 525-26). Claimant's cervical MRI revealed "mild uncovertebral spurring on the right at C3-4 producing mild right sided neural foraminal narrowing" but was otherwise negative. (Tr. at 525). Claimant's thoracic spine MRI was entirely negative, and revealed "no significant disc disease or canal stenosis." (Tr. at 526).

On September 25, 2009, Claimant called Dr. Dawson to report that she had gone to the emergency room the prior day "and they were very rude to her." (Tr. at 522).

Claimant reported having shooting pain, and that her medication was not helping. (*Id.*).

On November 5, 2009, Dr. Dawson treated Claimant for "neck pain, back pain, left hip pain, HA, left shoulder pain, arm pain, [and] left leg pain." (Tr. at 519). Claimant requested a dosage increase in Xanax, reported that her "muscle relaxer no longer works" and asked to start Skelaxin, reported that Lortab no longer worked and wanted to increase dosage or change prescription, and requested a handicap sticker or walking stick. (*Id.*). Claimant also requested "another letter for DHHR for food stamps and medical card." (*Id.*). Accordingly, Dr. Dawson provided a letter addressed "to whom it may concern," which was nearly identical to the June 17, 2009 letter, except that "cervical disc disease" was added to Claimant's list of maladies, and Dr. Dawson opined that Claimant was "unable to work at this time and will remain so for at least the next twelve months." (Tr. at 523). On November 9, 2009, Claimant called Dr. Dawson to request that her Soma dosage be increased for her neck muscles. (Tr. at 522).

On January 6, 2010, Claimant reported experiencing "left hip pain, back pain, neck pain, left shoulder pain, right foot severe pain which began when she woke, and left foot numbness. (Tr. at 518). Claimant also reported that Prednisone gave her pain and Albuterol made her sick and shaky. (*Id.*).

On June 30, 2010, Claimant sought treatment from Natavoot Chongswatdi, M.D. of University Physicians & Surgeons for back pain, difficulty breathing, and anxiety, among other complaints. (Tr. at 570). Claimant reported that "most pain" was occurring at "L4-L5 and left hip to groin" with "some numbness in groin area." (*Id.*). She reported her pain as registering at 7 on a scale of 10, which "worsens with motion [and] bending" although "Tramadol helps some," and that lying greater than 5 hours hurts. (*Id.*). Claimant's physical examination was entirely within normal limits. (Tr. at 571). Dr.

Chongswatdi assessed Claimant with anxiety, chronic obstructive pulmonary disease, and esophageal reflux. (*Id.*). Dr. Chongswatdi offered Claimant inhalers for her COPD which she declined due to cost, increased her Tramadol dosage, and referred her for pain management. (*Id.*). Dr. Chongswatdi also offered Claimant SSRI's for her mood, but she declined as she "does not want to go to Prestera." (*Id.*).

On August 3, 2010, Claimant was treated by Dr. Chongswatdi for "multiple, complex medical problems," which included left ankle pain, sleep difficulty, and anxiety. (Tr. at 567). Claimant's physical exam was again within normal limits as to her general appearance, eyes, lungs, cardiovascular system, and abdomen. (Tr. at 568). Some "tenderness was observed on ambulation in the ankles," but otherwise their appearance and motion was normal, while no tenderness on palpation, muscle spasm, pain from motion, instability, or weakness of the ankles was observed. (*Id.*). Dr. Chongswatdi assessed Claimant with dysphagia, lower back pain, anxiety, chronic obstructive pulmonary disease, esophageal reflux, thoracolumbar disc degeneration, fibromyalgia, and depression. (*Id.*). Dr. Chongswatdi prescribed Citalopram for Claimant's mood and renewed her pain medication.

On October 25, 2010, Claimant was treated by Dr. Chongswatdi "to discuss Tramadol and discuss problem with throat." (Tr. at 564). Claimant reported that her hips were somewhat better and back was about the same. (*Id.*). She also reported having neck pain which "starts right side, goes up to head," as well as jabbing pain and tingling, and "burning to neck and shoulders," which was not alleviated with ibuprofen. (*Id.*). Claimant also reported that her "mood did not do well with Celexa" as it "caused crying spells over 2 weeks." (*Id.*). Claimant again declined to seek treatment at Prestera. (*Id.*). Claimant's physical exam was entirely normal or otherwise within normal limits. (Tr. at 565). Dr.

Chongswatdi assessed Claimant with dysphagia, lower back pain, anxiety, and depression. (*Id.*). Dr. Chongswatdi ordered a barium swallow study for Claimant's throat, prescribed Zanaflex for her neck, and renewed her pain medication for her hips and back. (Tr. at 566).

On February 23, 2011, Rebecca Denning, Psy.D. conducted a diagnostic evaluation of Claimant for the purpose of developing mental health treatment recommendations. (Tr. at 641-42). Claimant reported "clinically significant symptoms of depression as well as PTSD," while Dr. Denning also noted Ms. Arthur's November 2010 diagnosis of ADHD. (Tr. at 641). Claimant reported receiving counseling following her divorce in 2005 and taking prescribed antidepressants in the past, but did not find either to be helpful. (*Id.*). Claimant's mental status exam reflects that her mood was depressed, affect was tearful at times, concentration was mildly deficient, and psychomotor activity exhibited pain behaviors. (*Id.*). Otherwise, her appearance, orientation, speech, eye contact, thought content, judgment, insight, memory, and social interactions were appropriate or within normal limits, and she denied any hallucinations/delusions or suicidal/homicidal ideations. (*Id.*). Dr. Denning diagnosed Claimant with "MDD, single episode moderate" and PTSD along Axis I, and assigned Claimant a current GAF score of 58.[1] (Tr. at 642). Dr. Denning described Claimant's prognosis as "fair" and noted "numerous physical problems and lack of social support." (*Id.*). Dr. Denning referred Claimant to Dr. Hyder

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. It should be noted that in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned as a measurement tool. However, a GAF score between 51 and 60 indicated "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

for medication management and further recommended cognitive behavioral therapy. (*Id.*).

On May 14, 2011, Muhammed Ali Hyder, M.D. completed a psychiatric assessment of Claimant and provided a mental RFC opinion. (Tr. at 630-36). During the interview, Claimant reported a "long history of psychiatric illness since age 20," (Tr. at 633), including depression which "never goes away though, on occasion, it becomes worse during which she will isolate herself for weeks, will not involve herself with personal care such as bathing and hygiene and reports having crying spells at that time with sleep and appetite disturbances as well as hopelessness." (Tr. at 634). Claimant also reported infrequent periods of hyperactivity or increased energy lasting up to two days, and nearly constant anxiety which includes symptoms of muscle tension, impaired concentration, "occasional panic-like attacks where her heart races," and tremors. (*Id.*). Dr. Hyder observed that Claimant "was a little fidgety, occasionally blurting out answers," while Claimant reported being impatient. (*Id.*). Claimant also reported that she had never been treated by a psychiatrist, but she had previously taken a broad range of SSRI medications prescribed by her primary care physicians. (*Id.*). However, she reported that "these medications made her worse." (*Id.*).

Claimant's mental status exam reflected that her mood was very anxious, as "[t]here were visible tremors in her body" and "[s]he cried during the interview," her affect was labile, and she had mild paranoid ideations. (Tr. at 635). Otherwise, Claimant's appearance, orientation, communication, and thought processes were within normal limits, and she denied any auditory/visual hallucination, paranoid or persecutory delusions, or any plans to hurt herself or others. (*Id.*). Dr. Hyder diagnosed Claimant with bipolar affective disorder, rule out psychotic features; post-traumatic stress disorder;

attention-deficit hyperactivity disorder combined type; and "rule out substance-induced mood disorder, rule out mood disorder due to general medical conditions" along Axis I, as well as "Cluster B Traits vs. Disorder" along Axis II, and assigned Claimant a GAF score of 35. (Tr. at 635-36). Dr. Hyder indicated that Claimant was accepted at Associates in Psychology & Therapy, and "will need regular psychotherapy for issues including her biracial heritage, negligence and cold parenting and post-traumatic stress disorder." (Tr. at 636). Dr. Hyder further instructed that Claimant "follow up with [him] in two weeks then monthly after that." (*Id.*).

In his mental RFC opinion, Dr. Hyder opined that Claimant was not in any way limited in her ability to understand, remember, and carry out instructions, or make judgments on work-related decisions, nor was she limited in her ability to interact appropriately with supervisors, coworkers, or the public, or to respond appropriately to usual work situations and changes. (Tr. at 630-31). Dr. Hyder did indicate that other capabilities were affected by Claimant's impairments, and referred back to his psychiatric assessment, (Tr. at 631), however it does not appear to include any work-related functional limitations.

On May 24, 2011, Claimant sought treatment from Gregory Chaney, M.D. to establish a primary care physician. (Tr. at 643). Claimant relayed that she "was in New York during 9/11," and reported a history of "respiratory illness, asthma/COPD," IBS, DJD, arthritis, hysterectomy, and gallbladder surgery. (*Id.*). She also indicated that she was receiving psychiatric treatment from Dr. Hyder. (*Id.*). Dr. Chaney observed that Claimant was "unable to stand toe and heels" and diagnosed her with degenerative disc disease, hematuria, allergies, asthma/COPD, and IBS. (Tr. at 644). Claimant's urinalysis results tested positive for cannabinoids and opiates, including hydrocodone. (Tr. at 646).

On June 22, 2011, Claimant began mental health treatment with Debra Stultz, M.D. pursuant to Dr. Hyder's referral. (Tr. at 658). Claimant reported symptoms of "exaggerated startle response and noise intolerance" as well as "depression, mood swings, GAP, panic attacks, and social anxiety" and "variable appetite, variable energy, decreased concentration, decreased memory, increased tearfulness, decreased interests, decreased motivation, decreased libido, and decreased self-esteem." (*Id.*). Claimant also reported experiencing "periods of irritability, aggression and paranoia," multiple symptoms of anxiety and agoraphobia, and symptoms of PTSD resulting from her experience in New York during the September 11 attacks. (*Id.*). Claimant reported that "regular antidepressants work the opposite on [her]," and that she has tried "every" antidepressant medication. (*Id.*). Claimant's mental status exam reflected that she was alert and oriented, and Dr. Stultz observed that Claimant was "initially very distrustful but warmed throughout the evaluations." (Tr. at 656). Claimant was also positive for vegetative signs and symptoms of depression as reflected in her history of present illness. (*Id.*). Claimant reported experiencing "thoughts of death, [but] not suicide." (*Id.*). Dr. Stultz diagnosed Claimant with PTSD, depressive disorder NOS – r/o bipolar (probable), anxiety disorder NOS, restless leg syndrome, and chronic pain. (*Id.*).

On August 23, 2011, Claimant met with Dr. Stultz. (Tr. at 655). Claimant complained of "increased pain, panic and stomach problems." (*Id.*). She relayed that she was "paranoid to leave [her] house," and that she was "isolating more and is easily overwhelmed." (*Id.*). Claimant also reported that she was not eating, had lost approximately 30 pounds in the past 2-3 months, had difficulty sleeping and decreased interests, and experienced "increased PTSD symptoms with approaching 9/11 anniversary." (*Id.*). Claimant also reported that her "ex was off of home confinement" and

that she was scared. (*Id.*). Claimant was "not suicidal but wishes she would die," however she did commit to safety and stated that her "religious beliefs stop her." (*Id.*). Dr. Stultz assessed Claimant with "PTSD, depression disorder NOS, R/O bipolar disorder, anxiety disorder NOS, restless leg syndrome, and chronic pain." (Tr. at 655). Dr. Stultz also "discussed need to do therapy" and "completed ability to work form." (*Id.*).

In her mental RFC opinion, Dr. Stultz opined that Claimant was extremely limited in her ability to carry out complex instructions and make judgments on complex work-related decisions; markedly limited in her ability to understand and remember both simple and complex instructions, and interact appropriately with the public, supervisors, and coworkers; and moderately limited in her ability to carry out simple instructions, make judgments on simple work-related decisions, and respond appropriately to usual work situation and to changes in a routine work setting. (Tr. at 652-53). Accordingly, Dr. Stultz opined that Claimant was "unable to work at this time and it is believed that this will last greater than one year." (Tr. at 653). Additionally, Dr. Stultz indicated that Claimant's "severe panic, anxiety and depression" caused her to be "very sensitive to noises" and "easily overwhelmed." (*Id.*).

### B. Medical Evaluations and RFC Opinions

#### 1. *State Agency Physical Evaluations*

On October 20, 2009, Kip Beard, M.D. conducted an internal medicine examination of Claimant, which included an interview and review of her medical history and medical records, and a full physical examination. (Tr. at 464-69). Claimant reported a history of ongoing back problems dating back to 2002; pain in the neck and back, which radiates to her legs, groin, arms and fingers, and also facial numbness; joint pain in the left hand, wrist, shoulder, hip, both knees and both ankles, as well as stiffness and

generalized numbness; and asthma and breathing difficulty. (Tr. at 464-65). Claimant also reported suffering from irritable bowel syndrome and experiencing symptoms of gastroesophageal reflux disease. (Tr. at 465).

Claimant's physical exam reflected that her "gait was a bit slow in pace, forward bent in posture without obvious unilateral limp." (Tr. at 466-67). Dr. Beard observed that Claimant "could stand unassisted" and "arise from a seat and step up and down from the examination table with pain," and appeared uncomfortable both seated and supine. (Tr. at 467). Dr. Beard's examination of Claimant's HEENT, neck, chest, cardiovascular system, abdomen, extremities, neurological system were all essentially unremarkable. (Tr. at 467-68). An accompanying ventilator function report revealed that Claimant suffered from "mild COPD." (Tr. at 472). Regarding Claimant's musculoskeletal system, examination of her cervical spine revealed some moderate discomfort on motion testing and paravertebral tenderness. (Tr. at 467). There was some pain and tenderness in Claimant's shoulders, but "no redness, warmth or swelling." (*Id.*). An accompanying x-ray report of Claimant's left hip revealed that her hip was normal. (Tr. at 470). Claimant complained of some left wrist discomfort and tenderness was observed, but she had normal motions in her left wrist and there was no observed redness, warmth, or swelling. (Tr. at 467-68). Examination of Claimant's hands was unremarkable. (Tr. at 468). Examination of Claimant's knees and ankles revealed some pain with tenderness but no redness, warmth, swelling, or effusion and "normal range of motion." (*Id.*). In her lumbosacral spine, Claimant complained of moderate pain with forward bending, while Dr. Beard observed "paravertebral tenderness and no spasm." (*Id.*). Claimant's flexion was "75 degrees with normal range of motion otherwise" and her seated and supine straight leg raising was "to 90 degrees with back pain." (*Id.*). Claimant's hips were

unremarkable. (*Id.*).  Claimant was able to heel walk, toe walk, tandem walk, and squat, although she had pain when doing so. (*Id.*).

Dr. Beard then diagnosed Claimant with "chronic cervical, thoracic, and lumbosacral strain with x-ray evidence of cervical and lumbar degenerative disk disease," "chronic arthralgias," "asthma/chronic obstructive pulmonary disease," and "irritable bowel syndrome, according to history." (Tr. at 468-69).  In his summary, Dr. Beard observed that Claimant's neck and back MRI's "note some degenerative disk disease without significant herniated nucleus pulposus or stenosis" and that his examination "revealed some moderate discomfort and some motion loss," however Dr. Beard "did not appreciate any obvious radiculopathy or myelopathy on exam." (Tr. at 469). Regarding her joints, Dr. Beard observed that "there are different areas of joint pain with some mild motion abnormalities" but he "did not identify any obvious inflammatory arthritis." (*Id.*). Claimant's lungs were clear to auscultation, there was no significant exertional dyspnea, and spirometry testing revealed "mild chronic obstructive pulmonary disease." (*Id.*). Claimant's bowel examination revealed "some mild abdominal tenderness," but was otherwise benign. (*Id.*).

On November 13, 2009, Gurcharan Singh, M.D. provided a physical RFC opinion of Claimant based upon Dr. Beard's examination. (Tr. at 496-503). Dr. Singh opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull, based on Dr. Beard's medical findings. (Tr. at 497). Dr. Singh opined that Claimant could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ladders/ropes/scaffolds "[d]ue to complaint of pain." (Tr. at

498). Dr. Singh assigned no manipulative, visual, or communicative limitations to Claimant. (Tr. at 499-500). As for environmental limitations, Dr. Singh opined that Claimant should avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, but could sustain unlimited exposure to wetness, humidity, and noise, based upon Claimant's allegations of pain. (Tr. at 500). Dr. Singh further observed that "Claimant's statements are partially credible since the medical evidence does not substantiate claimant's allegations to the degree alleged." (Tr. at 501).

On November 19, 2009, Dr. Singh provided a follow-up case analysis in light of Dr. Dawson's November 5, 2009 letter stating that Claimant was unable to work for the next 12 months. (Tr. at 504). Dr. Singh noted that Dr. Dawson's statement constituted an opinion "reserved to the commissioner" and observed that the note "did not add any more than the information which was already in the MER" and that the note was not supported by any accompanying physical examination. (*Id.*). Accordingly, Dr. Singh "affirmed as written" his prior RFC opinion. (*Id.*).

On February 26, 2010, Porfirio Pascasio, M.D. provided a physical RFC opinion based upon Dr. Beard's examination and Claimant's spine MRI and X-ray records. (Tr. at 542-49). Dr. Pascasio opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (Tr. at 543). Dr. Pascasio opined that Claimant could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ladders/ropes/scaffolds. (Tr. at 544). Dr. Pascasio assigned no manipulative, visual, or communicative limitations to Claimant. (Tr. at 545-46). As for

environmental limitations, Dr. Pascasio opined that Claimant should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and hazards, but could sustain unlimited exposure to extreme heat, wetness, humidity, noise, and vibration. (Tr. at 546). Dr. Pascasio further indicated that he agreed with Dr. Singh's "evaluation that claimant is partially credible." (Tr. at 547). Dr. Pascasio explicitly disagreed with Dr. Dawson's November 5, 2009 opinion that Claimant was unable to work for at least 12 months, and instead opined that "Claimant can perform a light type of work with the aforementioned limitations." (Tr. at 548).

On February 8, 2011, Stephen Nutter, M.D. completed an internal medicine examination and a physical RFC opinion regarding Claimant's ability to do work-related activities. (Tr. at 589-600). Claimant reported a history of back pain beginning in 1989 or 1990 when "she jumped off a small wall," and neck problems beginning in 2008 when she was assaulted. (Tr. at 589). Claimant reported experiencing "constant back pain that radiates down the left leg" and is "aggravated by bending, stooping, sitting, lifting, standing, coughing and riding in a car," as well as "constant neck pain that radiates the right arm" and is "aggravated by turning the head and rapid motions of the head and neck." (*Id.*). Claimant also complained of joint pain in her hands, elbows, knees, ankles, and left wrist and left hip. (Tr. at 590). She reported that her knee pain was constant but increased with walking, standing, kneeling, squatting, and going up and down stairs, and that her left knee has given out and caused her to fall in the past.  (*Id.*).

Dr. Nutter observed that Claimant "ambulate[d] with a normal gait, which is not unsteady, lurching, or unpredictable," did "not require the use of a handheld assistive device," and appeared "stable at station and comfortable in the supine and sitting positions." (*Id.*). Claimant's HEENT, neck, chest, cardiovascular system, abdomen, and

neurological system were all essentially unremarkable or otherwise within normal limits, except that Dr. Nutter noted that Claimant "cannot squat more than very slightly bending the knees due to back and knee pain." (Tr. at 591-93). Claimant's upper extremities and hands were also largely unremarkable, except that her grip strength was diminished for her age. (Tr. at 591).

Claimant experienced "pain in the left knee with range of motion testing," but there was no tenderness, redness, warmth, swelling, fluid, laxity, or crepitus in either of her knees, ankles, or feet, nor was there any calf tenderness, redness, warmth, cord sign, or Homans signs. (Tr. at 592). Claimant's knee extension was to 0° and flexion was to 150° bilaterally, plantar flexion of the ankle joints was to 40° bilaterally, and dorsiflexion was to 20° bilaterally. (*Id.*). Regarding Claimant's cervical spine, there was "no tenderness over the spinuous processes" and "no evidence of paravertebral muscle spasm." (*Id.*). Claimant's spine allowed 5° of flexion, 10° of extension, 10° of right lateral bending, 15° of left lateral bending, 45° of right rotation, and 20° of left rotation, while her neck was "aggravated by turning the head and rapid motions of the head and neck." (*Id.*). Claimant's dorsolumbar spine had normal curvature and there was "no evidence of paravertebral muscle spasm," although she did have "tenderness to the paraspinal muscles from the area of L3 to L5." (*Id.*).  Claimant's straight leg raise test was normal, and she was "able to stand on one leg at a time without difficulty." (*Id.*). Claimant could bend forward at the waist to 10° while lateral bending of the spine was to 0° bilaterally, although Dr. Nutter observed that when performing lateral and forward bending, there was "mostly just movement of the shoulders, head and neck," with no movement "at all in the lumbar spine laterally and just a little bit forward." (Tr. at 592). Furthermore, Claimant "complained of pain with range of motion testing of the lumbar spine." (*Id.*). Dr.

Nutter observed "no hip joint pain, redness, warmth, swelling, or crepitus" although there was "tenderness in the left hip, but not the right hip" and Claimant's "range of flexion of the hips with the knees flexed" was 100° bilaterally. (*Id.*).

Based upon his observations, Dr. Nutter diagnosed Claimant with "chronic cervical and lumbar strain without evidence of radiculopathy" and arthralgia. (Tr. at 593). In summary, Dr. Nuttar noted that Claimant had "pain and decreased range of motion of the cervical and lumbar spine with tenderness in the lumbar spine" but that her straight leg raise test was negative, sensory testing was intact, and there was "no definite evidence of nerve root compression." (*Id.*). Regarding Claimant's reported joint pain, Dr. Nutter observed no evidence of rheumatoid arthritis, "no rheumatoid nodules, capsular thickening, periarticular swelling or tophi" and "no ulnar deviation." (*Id.*).

In his RFC opinion, Dr. Nutter opined that Claimant could continuously lift and carry up to 10 pounds, frequently lift/carry up to 20 pounds, occasionally lift/carry up to 50 pounds, and never lift/carry over 50 pounds; could sit for three hours at one time, stand for two hours at one time, and walk for one hour at one time; could sit for four hours total, stand for three hours total, and walk for two hours total in an 8 hour workday; did not require a cane to ambulate; and had no limitations as to her hands or feet. (Tr. at 594-96). Dr. Nutter opined that Claimant could frequently climb stairs/ramps and balance; occasionally stoop, kneel, and crawl; and never climb ladders/scaffolds or crouch. (Tr. at 597). Dr. Nutter opined that Claimant could only frequently tolerate vibrations, but had no other environmental limitations. (Tr. at 598). Additionally, Dr. Nutter opined that Claimant could perform activities like shopping and could travel without a companion for assistance; ambulate without use of a wheelchair, walker, canes, or crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard

public transportation; climb a few steps at a reasonable pace with use of a single hand rail; prepare a simple meal and feed herself, and care for personal hygiene; and sort, handle, and use paper/files. (Tr. at 599). Furthermore, Dr. Nutter opined that the above limitations had lasted or would last for 12 consecutive months. (*Id.*).

### 2. *State Agency Mental Evaluations*

On October 27, 2009, Penny O. Perdue, M.A. provided a mental evaluation of Claimant consisting of a clinical interview and a mental status examination. (Tr. at 474-77). During the interview, Claimant reported experiencing daily symptoms of depression lasting all day, "a lack of interest in things, a 20 pound weight loss in the past year, difficulty sleeping, loss of energy . . . feelings of worthlessness. . . hopelessness, feelings of guilt, recurrent thoughts of death, poor concentration, and suicidal ideations without intent," as well as "excessive, severe anxiety and worry." (Tr. at 474). Claimant reported that she was in New York City during the September 11, 2001 attacks, and since then "she has experienced intrusive recollections of the event, nightmares, flashbacks, intense psychological distress when exposed to things that remind her of the attack." (*Id.*). She also reported a history of physical and mental abuse perpetrated by her father and a former partner. (Tr. at 475). Claimant reported a history of past counseling, but stated that she was not currently receiving counseling. (*Id.*).

In her mental status exam, Claimant's mood was observed as "depressed and anxious," her affect was "restricted with occasional tearfulness," and she reported suicidal ideations without intent. (Tr. at 476). Otherwise, Claimant's appearance, attitude and behavior, social interaction, orientation, speech, thought process, thought content, perception, insight, judgment, concentration, psychomotor activity, and immediate memory were within normal limits, although her recent memory "appeared moderately

deficient" and with her remote memory, she had "some difficulty relating specific dates of her history." (*Id.*). Accordingly, Ms. Perdue diagnosed Claimant with "major depressive disorder, single episode, moderate," "post traumatic stress disorder," and "anxiety disorder NOS," (*Id.*), based upon Claimant's reported symptoms and history. (Tr. at 476-77). Ms. Perdue opined that Claimant's prognosis was "poor." (Tr. at 477).

Claimant's activities of daily living are listed as consisting of "watching television, sitting at home, laying in bed and carrying for and petting her six cats," while her hobbies include "writing poetry and stories, and rescuing and caring for cats." (*Id.*). Claimant reported that she does not cook, "often just eats food (corn, spaghetti) cold out of the can," and uses paper products to avoid doing the dishes. (*Id.*). Claimant's father and sister help her with cleaning and shopping, although she reported that she could go as a last resort. (*Id.*). Claimant is physically able perform self-care activities such as grooming and hygiene, but "has to be forced (by her sister) to take care of herself." (*Id.*). In the past, Claimant has handled her own finances, but currently her father pays her bills for her. Claimant also cannot drive due to the effects of her medications. (*Id.*). Regarding social functioning, Ms. Perdue observed that Claimant's interaction was within normal limits, although Claimant reported no social activities and described herself as able to "fool people for a little while" that she's normal, but that "people are always scheming, want to use [her]." (Tr. at 477). Claimant's persistence and pace were within normal limits. (*Id.*).

On November 10, 2009, James W. Bartee, Ph.D. provided a psychiatric review technique and mental RFC opinion based upon Ms. Perdue's evaluation. (Tr. at 478-95). Dr. Bartee diagnosed Claimant with major depressive disorder and anxiety disorder NOS. (Tr. at 485, 487). Dr. Bartee concluded that Claimant did not meet any of the mental impairment Listing as she was only moderately limited in her activities of daily living and

maintaining social functioning; mildly limited in maintaining concentration, persistence, or pace; and suffered from no episodes of extended decompensation. (Tr. at 492-93). Regarding Claimant's mental RFC, Dr. Bartee opined that Claimant was "moderately limited" in her abilities to understand and remember detailed instructions; to carry out detailed instructions; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to travel in unfamiliar places or use public transportation. (Tr. at 478-79). Otherwise, Dr. Bartee opined that Claimant was "not significantly limited" with respect to any other functional capacities relating to understanding and memory, sustained concentration and persistence, social interaction, or adaptation. (*Id.*).

In summary, Dr. Bartee concluded that "Claimant has a number of mild to moderate limitations across the functional and adaptive domains resulting in a severe impairment" but that "these do not currently meet or equal any of the listings." (Tr. at 480). Accordingly, Dr. Bartee opined that Claimant had the mental RFC to "understand simple to mildly complex instructions and retain 2-3 steps in memory"; to "maintain focus to complete" tasks "in a slower paced, lower stress work-like setting with routine, periodic breaks across a normal work-related schedule"; to "maintain limited, infrequent and superficial contacts with supervisors and coworkers in a nonconfrontational setting" although "[c]ontact with the general public should be minimal"; and to "adjust to occasional changes in routine and task structure if given time to become familiar." (*Id.*).

Dr. Bartee further opined that Claimant "does not pose a hazard to herself or others in a routine work-like setting"; that she "can travel to and from both familiar locations but might need assistance initially to travel to unfamiliar locales" as she does not drive; and that she "can pursue short term goals of 3-4 weeks duration. (*Id.*). Dr. Bartee observed that Claimant's medical source data was internally consistent and in general accord with Claimant's allegations, although "some symptom exaggeration may be present." (*Id.*).

On February 22, 2010, Timothy Saar, Ph.D. provided a psychiatric review technique of Claimant based upon Ms. Perdue's evaluations. (Tr. at 528-41). Dr. Saar diagnosed Claimant with MDD and Anxiety NOS, but concluded that neither impairment was severe. (Tr. at 528, 531, 533). Dr. Saar concluded that Claimant did not meet any of the Listed mental impairments as she was only mildly limited in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace; and suffered from no episodes of extended decompensation. (Tr. at 538-39). Dr. Saar further noted that Claimant was "partially credible regarding c/s as severity not supported by the MER." (Tr. at 540).

On November 10, 2010, Rachel Arthur, M.A. completed a psychological evaluation of Claimant, which included a client interview, a mental status exam, and several psychological tests. (Tr. at 580-85). Claimant reported experiencing daily depression since 2005, with symptoms of depression beginning in childhood, becoming more prominent following the September 11 attacks, and progressively worsening following her mother's death in 2003 and her husband leaving her in 2005. (Tr. at 580). Claimant reported experiencing symptoms of depression which included a lack of interest in things, difficulty sleeping, a poor appetite, suicidal ideations without intent; symptoms of anxiety occurring daily and including difficulty controlling her worry, difficulty concentrating,

and irritability; and symptoms of ADHD/difficulty focusing and inattention beginning in childhood and currently including trouble keeping attention on tasks, inability to listen when spoken to directly, trouble organizing activities, often losing things needed for tasks and activities, being easily distracted, being forgetful in daily activities, fidgeting and being restless, and starting tasks without completing them, daydreaming excessively, and being inconsistent in the quality of her work. (Tr. at 580-81).

Claimant reported a brief history of counseling when going through her divorce in 2005, but was not currently receiving counseling. (Tr. at 581). Claimant did not believe that prior counseling or psychotropic medication had previously been very beneficial. (*Id.*1). Claimant reported activities of daily living consisting of sitting on the couch on bad pain days and trying to clean and "get things done" on good days, performing self-care tasks of grooming and hygiene with occasional prompts, light cleaning, cooking simple meals, driving, shopping for herself and handling her own finances. (Tr. at 582). Claimant previously enjoyed writing, playing pool and swimming prior to experiencing severe depression in 2005, but stated that she did not currently have any hobbies or attend social gatherings, and described herself as "antisocial." (*Id.*).

In the course of her mental status examination, Ms. Arthur observed that Claimant's mood was depressed; affect was restricted; concentration appeared mildly deficient compared to the average individual; psychomotor activity exhibited slight fidgeting; and she reported occasional suicidal ideations without intent. (*Id.*). Otherwise, Claimant's appearance, attitude, social interaction, speech, orientation, thought process, thought content, perceptual experiences, insight, judgment, and immediate memory were all within normal limits or appropriate. (*Id.*).

Ms. Arthur then provided a Diagnostic Impression of major depressive disorder, single episode-severe without psychotic features along Axis I, based upon Claimant's reported problems and history; deferred diagnosis along Axis II and recommended personality testing in order to rule out personality psychopathology that may be contributing to impairment in functioning; and assigned Claimant a GAF score of 42.[2] (Tr. at 582-83). Ms. Arthur further opined that Claimant's prognosis was "fair to poor given Ms. Lewis' numerous physical problems and lack of social supports." (Tr. at 583). Ms. Arthur recommended intensive individual and group psychotherapy in order to improve overall functioning and indicated that Claimant might also benefit from psychotropic interventions. (*Id.*).

On the Brown Attention Deficit Disorder Scale, Claimant's overall score of 94 suggested "significant impairment in organizing and activating for work, sustaining attention and concentration, sustaining energy and effort, managing affective interference, utilizing 'working memory' and accessing recall." (Tr. at 584). Claimant's Beck Depression Inventory-2d edition score of 48 corresponded with the severe range of depressive symptoms, and her Beck Anxiety Inventory score of 43 corresponded with the severe range of anxiety symptoms. (*Id.*).

Ms. Arthur reiterated her diagnosis, and indicated that Claimant's incapacity was expected to last "well over a year." (Tr. at 585). Ms. Arthur further opined that Claimant "will likely have great difficulty dealing with work stressors and interacting with others in a stable and socially appropriate manner." (*Id.*).

On May 4, 2011, Lisa Tate, M.A. provided a psychological evaluation consisting of a

---

[2] A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

clinical interview, a mental status examination, and intelligence testing, as well as a mental RFC opinion. (Tr. at 617-27). During the interview, Claimant complained of depression, anxiety, and medical problems. (Tr. at 618). She reported experiencing symptoms of depression including "loss of interest in activities, loss of energy, crying, social withdrawal, feelings of hopelessness, feelings of helplessness, and feelings of ambivalence regarding life," occurring consistently since 2006. (*Id.*). She reported symptoms of anxiety including "heart racing, a tendency to breathe fast, and excessive worry," occurring constantly for as long as she can recall. (*Id.*). Claimant also reported that she sometimes worries "to the point she is not able to function," that she "feels she is a prisoner of her own mind," and her symptoms increase when in public. (*Id.*). Claimant reported that she had previously been diagnosed with PTSD in 2002, in relation to the September 11 attacks. (*Id.*). Claimant reported that she "continues to dream of the event" and "has difficulty tolerating sirens and she is no longer able to watch the news." (*Id.*). Claimant reported that she was currently receiving mental health treatment and had been for two to three months. (Tr. at 619).

Claimant's mental status exam reflected that her mood was depressed, affect was restricted and slightly tearful, recent memory was mildly deficient, and concentration was mildly deficient. (Tr. at 620-21). Otherwise, her orientation, thought processes, thought content, insight, judgment, immediate memory, remote memory, and psychomotor behavior were all within normal limits or otherwise appropriate. (*Id.*). Claimant reported no unusual perceptual experiences, and denied suicidal or homicidal ideations. (*Id.*). Claimant's intelligence testing was unremarkable. (Tr. at 621). Accordingly, Ms. Tate diagnosed Claimant with "major depressive disorder, recurrent, moderate" and "anxiety disorder NOS with features of post-traumatic stress disorder" along Axis I, based upon

Claimant's report of symptoms. (Tr. at 621-22). Claimant described activities of daily living, consisting of "watching television, taking care of her cats, heating up microwave food, and washing dishes" on a daily basis; showering, doing laundry, and going to the gas station to purchase cigarettes on a weekly basis; and going to the grocery store once a month. (Tr. at 622). Ms. Tate observed Claimant's concentration to be mildly deficient, but her social functioning, persistence, and pace were within normal limits. (Tr. at 623).

In her mental RFC opinion, Ms. Tate opined that Claimant had no limitations in her abilities to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions; and "mild" limitations in her abilities to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions, based upon her mildly deficient recent memory. (Tr. at 625). Ms. Tate also opined that Claimant had "moderate" limitations in her abilities to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting, given that "her "level of depression and anxiety may impact functioning." (Tr. at 626).

### 3. Claimant Referral Mental Evaluation

On November 17, 2010, licensed psychologist Richard Reeser, M.A. provided a psychological evaluation and a mental RFC opinion of Claimant pursuant to a referral from her attorney. (Tr. at 573-75). The evaluation included a clinical interview and review of history, review of medical records and treatment notes, a mental status exam, and a Millon Clinical Multiaxial Inventory (MCMI-III). (*Id.*). During the clinical interview, Claimant reported that she had previously been diagnosed with ADHD and depression, as well as symptoms which included "periods of uncontrollable crying for the past 1-2 years"

with "occasional good days," fluctuating appetite and weight, fluctuating sleep and difficulty sleeping, loss of interest in socializing, stomach pain and headaches occurring 3 times per week, prior suicidal thoughts and "often feel[ing] like she would rather just die," "anger control problems expressed verbally for the past 2 years that is worse recently," and "irritability and frustration." (Tr. at 573). Claimant denied drug or alcohol use and prescription drug misuse.

Claimant's mental status exam reflected that her verbal content was "marked by sadness, fear, and anger," affect was flat and tearful, mood was depressed and anxious, and that she reported that "she frequently sees her deceased mother's spirit and she sometimes tastes a strange taste." (Tr. at 574). Otherwise, Claimant's appearance, thought processes, thought content, orientation, memory, judgment, and insight were essentially within normal limits. (*Id.*). Claimant's MCMI-III results reflected that "her response style may indicate a broad tendency to magnify the level of experienced illness, a characterological inclination to complain or to be self-pitying, or convey feelings of extreme vulnerability associated with a current episode of acute turmoil." (*Id.*).

Mr. Reeser diagnosed Claimant with "depressive disorder NOS; anxiety disorder NOS; PTSD; major depression single episode, moderate (by history); rule out schizoaffective disorder and generalized anxiety disorder" along Axis I; and deferred diagnosis along Axis II, but ruled out schizotypal, avoidant, and paranoid personality disorders with negativistic (passive-aggressive) personality traits. (*Id.*). In conclusion, Mr. Reeser noted Claimant's report of "difficulty dealing with past trauma and mood symptoms consistent with depression and anxiety disorders," and concluded that "[t]he records support problems in these areas." (Tr. at 575). Mr. Reeser opined that "multiple and severe psychological problems significantly compromise her ability to be gainfully

employed," but that Claimant appeared competent to manage any funds awarded to her. (*Id.*).

In his mental RFC opinion, Mr. Reeser opined that Claimant was "markedly" limited in her ability to carry out complex instructions, make judgments on complex work related decisions, and respond appropriately to usual work situations and to changes in a routine work setting; "moderately" limited in her ability to understand and remember complex instructions, interact appropriately with the public, supervisors, and co-workers; and "mildly" limited in her ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions. (Tr. at 576-77). Mr. Reeser elaborated that Claimant's "interview, background information, and test results indicate substantial impairment in work-related mental activities." (*Id.*). Mr. Reeser also opined that the limitations assigned to Claimant were first present in 2009, as there were "[n]o records of impairment before then." (Tr. at 577).

## VI.  Scope of Review

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its

judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered all of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

**VII.   Analysis**

Claimant alleges that the Commissioner's decision is not supported by substantial evidence on the ground that her physical and mental impairments in combination equal a Listed Impairment, or in the alternative that her impairments prevent her from engaging in substantial gainful activity. (ECF No. 11 at 5). In support of her claims, Claimant argues that the ALJ (1) incorrectly found that Claimant's PTSD was not a severe impairment. (*Id.* at 6-7); (2) improperly assessed Claimant's credibility. (*Id.* at 7-9); and (3) failed to accord proper weight to Claimant's treating source opinions. (*Id.* at 10-12).

**A.  Combination of Impairments Equivalent to a Listing**

Claimant asserts that "[o]bviously, the [Claimant's] physical and mental impairments in combination equal a Listed Impairment," given that she "suffers from the

following: post-traumatic stress disorder, depression, anxiety, headaches, asthma, degenerative joint disease, COPD, irritable bowel syndrome." (*Id.* at 5). However, Claimant fails to identify which Listed Impairment is met by her combination of conditions.

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* §§ 404.1525, 416.925. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

Courts in this jurisdiction have repeatedly rejected as meritless, such arguments as Claimant's where she "does not even attempt to specify which listing she believes her conditions meet," because it is the claimant's burden to prove that her condition equals one of the listed impairments. *Thomas v. Astrue*, Civil Action No. 3:09-00586, 2010 WL 4918808, at *8 (S.D.W.V. Nov. 24, 2010); *see also Vance v. Astrue*, No. 2:11-cv-0781, 2013 WL 1136961, at *17 (S.D.W.V. Mar. 18, 2013); *Berry v. Astrue*, No. 3:10-cv-00430, 2011 WL 2462704, at *9 (S.D.W.V. Jun. 17, 2011); *Spaulding v. Astrue*, No. 2:09-cv-

00962, 2010 WL 3731859, at *16 (S.D.W.V. Sept. 14, 2010). Moreover, substantial evidence supports the ALJ's determination that Claimant's combination of impairments does not equal in severity any of the impairments listed. As the ALJ noted, Claimant does not meet Listing 1.04 (disorders of the spine) because there is "no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication." (Tr. at 19). Likewise, the ALJ appropriately determined that Claimant does not meet Listing 12.04 (affective disorders) or Listing 12.06 (anxiety-related disorders) because she has only mild restriction of activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation of extended duration, as evidenced by her own admissions. (Tr. at 19-20). Claimant offers no evidence or argument to contradict the ALJ's findings. Therefore, the Court rejects Claimant's contention that her physical and mental impairments in combination equal a Listed Impairment.

### B. Severity of Post-Traumatic Stress Disorder

Claimant objects to the ALJ's finding that her PTSD was not a severe impairment. (ECF No. 11 at 6). Claimant highlights several instances in which consulting examining psychologists and treating psychiatrists referred to Claimant's PTSD as stemming from the September 11 attacks, and argues that the ALJ's conclusion was "without merit in light of the findings of the Plaintiff's treating sources and non-treating sources." (*Id.*). The undersigned is not persuaded by Claimant's analysis of the record.

First, Claimant's various diagnoses of PTSD, (Tr. at 476, 574, 622, 636, 642, 656), are not inconsistent with the decision, as the ALJ found Claimant's PTSD to be a medically determinable mental impairment. (Tr. at 19). Moreover, the medical source

"findings" that Claimant refers to in her brief, (ECF No. 11 at 6-7), were derived entirely from Claimant's subjective report of events and symptoms during the course of her interviews for presenting symptoms. (Tr. at 474, 573, 580-81, 618).

Second, although Claimant described various symptoms to her consultative examiners, she does not appear to have ever sought counseling or mental health treatment during the period of alleged disability[3] until February 23, 2011, or three and a half years after the date of her alleged disability. (Tr. at 641-42). Claimant did receive mood altering medication from Dr. Dawson between February 2009 and January 2010, however treatment notes are void of any indication of symptoms or observations relating to PTSD. (Tr. at 446-59, 517-24). Similarly, although Dr. Chongswatdi's treatment notes from June 2010 to October 2010 reflect more generalized symptoms of anxiety and depression, which the ALJ determined to be severe impairments, there is no evidence that Claimant ever reported a history of traumatic experience or that she reported any difficulties relating to PTSD. (Tr. at 564-72). Claimant testified during the first administrative hearing that she wanted therapy but could not afford it, (Tr. at 43), but the record indicates that she repeatedly refused Dr. Chongswatdi's recommendation that she seek treatment at Prestera Centers for Mental Health. (Tr. at 564, 571). Claimant apparently began receiving mental health treatment from Dr. Hyder in February 2011, however the administrative record contains only an initial psychiatric assessment, and is void of any subsequent treatment notes. (Tr. at 633-36). Treatment records from Dr. Stultz similarly reflect only an initial assessment in June 2011, and one subsequent appointment in August 2011. (Tr. at 655-59). Claimant's sparse mental health treatment is inconsistent with her claim of severe impairment due to PTSD. *See Mickles v. Shalala*,

---

[3] Claimant reportedly received counseling for several months in 2005 following her divorce, but did not believe it to have been helpful. (Tr. at 475, 581, 641-42).

29 F.3d 918, 930 (4th Cir. 1994) (holding that "it was not improper for the ALJ to consider the level and type of treatment [the claimant] sought and obtained in determining what weight to accord her allegations" of symptoms and severity). The overall paucity of treatment records reflecting any limiting complaints or symptoms of PTSD undercuts Claimant's reports of symptoms to the consultative examiners.

Third, the undersigned observes that Claimant continued to work for seven years after the September 11 attacks. (Tr. at 182-88, 201-03). Even after the date of disability onset, Claimant worked as much as 40 hours per week in October 2007, 30 hours per week between November 2007 and April 2008, and 25 hours per week between April 2008 and July 2008. (Tr. at 24, 192-98). Additionally, Claimant reported activities of daily living which include watching television, feeding and caring for her cats, maintaining personal hygiene, preparing meals, doing household chores including laundry, dishes, and light gardening, going outside three times per week, driving occasionally, and grocery shopping. (Tr. at 209-14). This level of activity is inconsistent with Claimant's assertion that her PTSD limited her "ability to perform basic mental work activities," (Tr. at 19), and she offers no explanation to reconcile this discrepancy.

Claimant's subjective reports comprise the only evidence that her PTSD constitutes a severe impairment. In contrast, Claimant's medical history, work history, self-reported activities of daily living all reflect that Claimant's PTSD was not nearly as severe as she alleges. Indeed, the ALJ's finding is also consistent with his less than favorable assessment of Claimant's credibility. *See infra* Part VII.C. Accordingly, the undersigned finds that the ALJ's determination that Claimant's PTSD is not a severe impairment is supported by substantial evidence on the record.

## C. Determination of Claimant's Credibility

Claimant also contends that the ALJ improperly assessed her credibility. (ECF No. 11 at 7). She argues the ALJ failed to apply the proper legal standard for assessing credibility and failed to articulate the reasons for discounting Claimant's credibility. (*Id.* at 7-10). In contrast, the Commissioner argues that the ALJ properly followed the two-step process articulated in the Regulations, and that his credibility determination was supported by substantial evidence on the record. (ECF No. 12 at 13-18). Having carefully reviewed the ALJ's credibility assessment, the Court agrees with the Commissioner.

Pursuant to the Regulations, the ALJ evaluates the reliability of a claimant's report of symptoms using a two-step method. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the alleged symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity,

persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques. *Id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5.

> In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:
>
> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to

be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ provided a detailed overview of the medical evidence and consultative evaluations, throughout which he compared and contrasted Claimant's testimony, and then provided a logical basis for discounting the credibility of Claimant's statements regarding the severity of her symptoms. (Tr. at 21-25). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms she alleged, but that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were only partially credible. (Tr. at 23). Specifically, the ALJ observed multiple inconsistencies in Claimant's statements throughout the record. The ALJ noted that Claimant alleged no drug use, but tested positive for marijuana and narcotics. (Tr. at 23, 646). The ALJ also observed that Claimant's reports of disabling symptoms of depression were inconsistent with her work history and overall lack of mental health treatment. (Tr. at 23). Likewise, both Claimant's ability to continue working after her alleged disability onset date and her reported activities of daily living were inconsistent with her complaints of disabling symptoms and limitations relating to her physical impairments. (Tr. at 23-24). These findings are supported by substantial evidence on the record.

Claimant finds it "difficult to understand how the [ALJ] concluded that Plaintiff can perform light and sedentary work" in light of objective medical evidence, including MRI scans of Claimant's spine and the examination results of Dr. Beard and Dr. Nutter. (ECF No. 11 at 8). However, in his written opinion the ALJ described in detail the results of Claimant's spine MRI's and examinations by Dr. Beard and Dr. Nutter, (Tr. at 22), and then explicitly accorded great weight to Dr. Nutter's accompanying RFC opinion, (Tr. at 24), which included limitations corresponding with the ability to perform light work. (Tr.

at 589-600). Likewise, both Dr. Singh and Dr. Pascasio provided RFC opinions based upon Dr. Beard's medical examination, each of which included limitations corresponding with the ability to perform light work. (Tr. at 496-503, 542-49). Moreover, both Dr. Singh and Dr. Pascasio agreed that Claimant's statements were only "partially credible since the medical evidence does not substantiate Claimant's allegations to the degree alleged." (Tr. at 501, 547). In short, it is clear that the ALJ conducted a thorough analysis of the relevant evidence, appropriately weighed the medical source opinions, and provided a logical basis for discounting the credibility of Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms, in accordance with the applicable Regulations.

Other errors assigned by Claimant to the ALJ's credibility determination are equally meritless. First, Claimant argues that under the "mutually supportive test" recognized in *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987), she satisfies the requirements of 42 U.S.C. § 423(d)(5)(A) because her testimony is supported by objective medical source findings. (ECF No. 11 at 7). Claimant misinterprets the holding in *Coffman*. There, the issue was not whether the ALJ erred in assessing the claimant's credibility, but whether the ALJ applied the appropriate legal standard in weighing the treating physician's opinion that the claimant was disabled from gainful employment. *Coffman*, 829 F.2d at 517-18. The United States Court of Appeals for the Fourth Circuit found that the ALJ had misapplied the relevant standard by discounting the physician's opinion due to the alleged lack of corroborating evidence, when the correct standard was to give the opinion great weight *unless* persuasive contradictory evidence was present in the record. *Id.* at 518. The Fourth Circuit then pointed out that evidence supporting the physician's opinion, in fact, existed in the record, noting "[b]ecause Coffman's complaints

and his attending physician's findings were mutually supportive, they would satisfy even the more exacting standards of. . . 42 U.S.C. § 423(d)(5)(A)." *Id. Coffman* offers no applicable "test" for assessing a claimant's credibility and, consequently, is inapposite. As the written decision in the present case plainly reflects, the ALJ applied the correct two-step process in determining Claimant's credibility.

Second, Claimant argues that the ALJ's use of "boilerplate" credibility language warrants remand on the ground that such language "provides no basis to determine what weight the [ALJ] gave the Plaintiff's testimony." (ECF No. 11 at 9). It is well-established that "ALJ's have a duty to explain the basis of their credibility determinations, particularly where pain and other nonexertional disabilities are involved." *Long v. United States Dep't of Health and Human Servs.*, No. 88-3651, 1990 WL 64793, at *2 n.5 (4th Cir. May 1, 1990). Social Security Ruling 96-7p instructs that "[w]hen evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individuals statements." SSR 96-7p, 1996 WL 374186, at *4. Moreover, the ALJ's credibility finding "cannot be based on an intangible or intuitive notion about an individual's credibility." *Id.* Rather, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.* Thus, a "bare conclusion that [a claimant's] statements lack credibility because they are inconsistent with 'the above residual functional capacity assessment' does not discharge the duty to explain." *Kotofski v. Astrue*, Civil No. SKG-09-981, 2010 WL 3655541, at *9 (D. Md. Sept. 14, 2010); *see also Stewart v. Astrue*, Action No. 2:11-cv-597, 2012 WL 6799723, at *15 n.15 (E.D.Va. Dec. 20, 2012). To the contrary, the decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be

sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4. Here, the ALJ admittedly used "boilerplate" language in finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. at 23). However, the ALJ did not stop his analysis with only that bare conclusion. As discussed above, the ALJ went on to document multiple instances in which Claimant's statements were inconsistent with objective medical evidence, her sparse treatment history, her past work history, and her ongoing activities of daily living. (Tr. at 23-24). The ALJ's credibility finding was sufficiently articulated, as he explained his rationale with references to the specific evidence that informed his decision.

Consequently, the Court finds that the ALJ followed the proper agency procedures in assessing Claimant's credibility and weighing medical source opinions.

### D. Weight Accorded to Treatment Provider Opinions

Finally, Claimant argues that the ALJ failed to provide adequate explanation for discounting the opinions of her treatment providers, Dr. Stultz and Dr. Dawson. (ECF No. 11 at 10-12). According to Claimant, the ALJ "summarily stated that he found [Dr.] Stultz's opinion 'not entirely reliable,'" and "[t]hat's it!" (*Id.* at 11). Similarly, Claimant asserts that the ALJ "called [Dr.] Dawson's record into question," but that this observation was inadequate to discharge "the duty of fairness owed to the Plaintiff." (*Id.* at 11-12). Claimant mischaracterizes the nature and content of the ALJ's determination.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the

relevant evidence [she] receive[s]." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite [her] impairment(s), and [her] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). In the context of determining an individual's RFC, the ALJ must always consider and address medical source opinions, and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7.

In general, the ALJ will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight will be allocated to the opinion of a treating physician because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). However, the ALJ must analyze and weigh all medical source opinions in the record, including those of non-examining sources. *Id.* §§ 404.1527(e), 416.927(e). Relevant factors include: (1) length of the treatment relationship and frequency of evaluation; (2) nature and extent of the treatment relationship, (3) degree to which an opinion is supported by relevant evidence and explanations; (4) consistency of an opinion with the record as a whole, (5) whether the source is a specialist in the area relating to the rendered opinion; and (6) any other factors which tend to support or contradict the opinion, including "the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record. *Id.* §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions; they are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."[4] SSR 96-5p, 1996 WL 374183 *2. However, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.*

> If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR 404.1527(d) and 416.927(d).[5]

*Id.* at *3.

If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79

---

[4] Examples of issues reserved to the Commissioner include "(1) whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings; (2) what an individual's RFC is; (3) whether an individual's RFC prevents him or her from doing past relevant work; (4) how the vocational factors of age, education, and work experience apply; and (5) whether an individual [is unable to work or] is 'disabled' under the Social Security Act." SSR 96-5p, 1996 WL 374183 *2.

[5] The applicable factors are now found at 20 C.F.R. §§ 404.1527(c), 419.927(c).

(7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d. 700, 705 (3rd Cir. 1981)). Ultimately, it is the responsibility of the ALJ, rather than the court, to evaluate the case, make findings of fact, resolve conflicts of evidence, *Hays*, 907 F.2d at 1456, and provide good reasons in the written decision for the weight given to the opinions. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

Here, the ALJ provided well-reasoned explanations as to why he discounted the opinions of both Dr. Dawson and Dr. Stultz. (Tr. at 24-25). As the ALJ observed, at the time of the written decision, Ms. Stultz' treatment of Claimant "ha[d] not been for long and the longitudinal evidence shows that the claimant is not as limited as [Dr. Stultz's] report indicates." (*Id.*). Indeed, the record reflects that as of the ALJ's decision, Dr. Stultz had only met with Claimant twice, on June 22, 2011 and August 23, 2011. (Tr. at 655-58). Furthermore, the ALJ noted that Dr. Stultz's opinion relied heavily upon Claimant's subjective statements, which he had already "found not to be entirely reliable." (Tr. at 25).

Regarding Dr. Dawson's opinion, the ALJ did note that "the West Virginia Board of Osteopathic Medicine has suspended Dr. Dawson's [license] for over prescribing medication, which does not enhance her opinion." (Tr. at 24). However, the ALJ also explained that although treating source opinions as to disability are never entitled to controlling weight, the ALJ nevertheless had considered Dr. Dawson's June 17, 2009 and November 5, 2009 opinions that Claimant was unable to work for the next 6 and 12 months, respectively. (*Id.*). The ALJ explained that he gave Dr. Dawson's opinions little weight because they were "based upon the claimant's subjective complaints and [were] inconsistent with the overall medical record." (*Id.*). The undersigned further observes that both opinion letters are extremely brief and provide no rationale or reference to findings in support of her conclusion. (Tr. at 457, 523). They are also entirely inconsistent

with the findings and opinions of agency evaluators Dr. Beard, Dr. Singh, Dr. Pascasio, and Dr. Nutter.

Accordingly, the record unequivocally establishes that the ALJ fully considered the RFC opinions of both Dr. Dawson and Dr. Stultz, weighed them based upon the factors set forth in the regulations, and explained the reasons for affording each opinion little weight. Thus, the ALJ followed the appropriate process, and his final assessments of Claimant's treating source opinions are supported by substantial evidence in the record.

**VIII.  <u>Conclusion</u>**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  November 21, 2013.

Cheryl A. Eifert
United States Magistrate Judge

- 48 -